**The CHASE MANHATTAN BANK, N.A., Appellant,**

v.

**J & L GENERAL CONTRACTORS, INC., McWaters Trucking Co., and James McWaters, Appellees.**

**No. 09–91–160 CV.**

Court of Appeals of Texas, Beaumont.

June 25, 1992.

As Amended July 6, 1992.

Joy Soloway, Fulbright & Jaworski, Houston, for appellant.

Richard G. Baker, Angela A. Zbranek, Zeb Zbranek, Hight, Baker & Zbranek, Thomas A. Wheat, Wheat & Wheat, Liberty, for appellees.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

WALKER, Chief Justice.

Appellant, Chase Manhattan Bank, N.A., one of the plaintiffs below, appeals the final judgment entered in Cause No. 40,965 by the 253rd Judicial District Court of Liberty County, Texas, the Honorable W.G. Woods, Jr., presiding. Other plaintiffs below, Bank One, Texas, N.A., successor-in-interest to the Deposit Insurance Bridge

Bank, N.A. and N.C.N.B. Texas National Bank, N.A., successor-in-interest to Interfirst Bank Houston, N.A., have chosen not to prosecute an appeal from the trial court's judgment.

Appellees are McWaters Trucking Company, James McWaters and J & L General Contractors, Inc. For brevity and convenience in this opinion, we shall refer to Chase Manhattan Bank, N.A. as "Chase" and to J & L General Contractors, Inc. as "J & L."

Chase and the two other banks heretofore referenced brought suit against J & L, McWaters Trucking Company and James McWaters alleging that J & L had defaulted on a $500,000.00 promissory note; that J & L breached a Guaranty Agreement; that McWaters Trucking Company unlawfully converted to its own use property in which the banks had a perfected security interest; that the corporate veils of J & L and McWaters Trucking Company should be pierced making McWaters Trucking Company liable for J & L's liability to the banks; and that James McWaters, personally, should be held liable for J & L's and McWaters Trucking Company's liabilities to the banks.

This case was tried without a jury and the trial court entered judgment awarding the banks relief against J & L on J & L's note obligation, but not on J & L's guaranty obligation. The trial court further denied the banks any relief against McWaters Trucking Company and James McWaters. The banks filed a Motion to Modify, Correct or Reform the Judgment, same being denied by operation of law.

Chase appeals that portion of the judgment denying its recovery against J & L on J & L's guaranty obligation and denying it any recovery against James McWaters and McWaters Trucking Company. Chase also appeals the denial of its Motion to Modify, Correct or Reform the Judgment.

Factually, James McWaters and his family owned and operated J & L from 1955 until 1981. J & L was engaged in the business of hauling lumber. James McWaters was the majority stockholder of J & L and his son, Ronnie McWaters, and other family members owned the remaining shares. The McWaters family served as directors, officers and employees of J & L.

On October 16, 1981, the McWaters family entered into a Stock Purchase Agreement with Delta Oilfield Services, Inc. which shall be referred to as "Delta." By way of this Stock Purchase Agreement, the McWaters family sold their stock in J & L to Delta for $3,500,000.00. As consideration for this sale, the McWaters family received $1,500,000.00 in cash and a $2,000,000.00 promissory note which we refer to as the "Delta Note." Delta pledged the J & L stock to the McWaters family as security for the Delta Note. Subsequent to the sale, James McWaters continued to serve as J & L's president and worked at J & L's business premises daily.

It is clear that the Stock Purchase Agreement expressly granted Delta the right to pledge J & L assets. We quote from that agreement:

> ... [I]t is stipulated that the mortgaging, encumbering, pledging, hypothecation, of Company [J & L] assets shall not be construed as affecting the value of the stated security, and is specifically declared to be permissible.

The Stock Purchase Agreement did not require Delta to obtain James McWaters' signature or permission before pledging J & L's assets.

In December 1981, Oilfield Enterprises, Inc., hereinafter referred to as "OEI," a wholly owned subsidiary of Delta, borrowed $8.5 million from the Chase, MBank and Interfirst Banks. The terms of that loan were set forth in a Letter Agreement dated December 7, 1981. That Letter Agreement provided that an amount of money "... [n]ot to exceed $500,000.00 would be advanced to J & L to enable J & L to pay in full all indebtedness of J & L for borrowed money, such advance to be evidenced by a promissory note of J & L payable to the order of the company [OEI], which would become a Pledged Note." The Letter Agreement further provided that J & L and Gulf Coast granted "... to the Banks, for their joint benefit, a security

interest in and general lien upon the Security." The Letter Agreement defined the word "Security" to mean the following:

> ... [T]he below described personal property owned by J & L ... whether now or hereafter existing or now owned ... or hereafter acquired, and wherever located, namely: (i) all accounts, contract rights and general intangibles ... (ii) all equipment ... (iii) all inventory ... and (iv) all proceeds and products of any thereof....

The banks funded the money set forth in the Letter Agreement and OEI paid the creditors who held liens on J & L's equipment.

Appellant contends that the banks perfected their lien in J & L's non-vehicle equipment, granted by the terms of the Letter Agreement, by filing financing statements with the Texas Secretary of State. The question of whether or not such lien was properly perfected is the paramount issue in this appeal.

J & L guaranteed OEI's payment obligations to the banks. J & L also executed a promissory note in the principal amount of $500,000.00 in favor of OEI payable five (5) years from the date of execution. This note was also pledged to the banks.

It is clear from the record that although James McWaters continued to serve as J & L's president during this time, that he was not informed that J & L executed a promissory note or a guaranty, or that J & L gave the banks a lien on any of its properties.

In March of 1984, the banks made demand on OEI to pay the outstanding indebtedness due pursuant to the letter agreement. OEI did not pay. The banks then made demand on J & L to satisfy its guaranty obligation. J & L did not honor same.

Delta, being unable to meet its payment obligations to the McWaters family on the Delta Note, required the McWaters family to foreclose and regain ownership of J & L's stock in April, 1984. When the McWaters family regained ownership of J & L's stock, J & L was "broke." James McWaters testified that he understood by foreclosing on J & L's stock, he and his family were regaining ownership of J & L's assets, as well as regaining ownership of J & L's liabilities. Prior to the foreclosure by the McWaters family, the McWaters family did not inquire of Delta whether it had pledged J & L's assets to third parties. When Mr. James McWaters was asked whether or not he or any representative of J & L investigated with the Texas Secretary of State to see whether any U.C.C.–1 forms or liens had been filed on J & L's assets, Mr. McWaters testified, "I don't believe so."

On April 2, 1984, McWaters Trucking Company was formed to carry on the same business previously conducted by J & L and by the McWaters family or shareholders, directors, officers and employees of McWaters Trucking Company as they were with J & L. Approximately one month after McWaters Trucking Company was incorporated, J & L transferred certain equipment, including its non-vehicle equipment, to McWaters Trucking Company. The banks contended that they had perfected a security interest in and to this equipment. In consideration of the transfer of the equipment, McWaters Trucking Company assumed some of J & L's debts, but not J & L's debt to the banks. The record reflects that at the time of the transfer of J & L's non-vehicle equipment, said equipment had a value of $268,000.00. James McWaters did not seek the banks' permission to transfer J & L's non-vehicle equipment to McWaters Trucking Company. Appellant contends that J & L failed to honor the terms of the Guaranty Agreement and is therefore, liable to Chase, the holder of the Guaranty Agreement, for the outstanding principal and accrued interest. Further, that J & L transferred equipment to McWaters Trucking Company in which Chase had a properly perfected security interest, said transfer constituting a conversion of the property covered by Chase's security interest. Appellant also contends that James McWaters orchestrated the transfer of all the assets of a debt-ridden, closely held, corporation controlled by his family to a debt-free, closely held, corporation controlled by his family. Appellant

contends that James McWaters admitted creating McWaters Trucking Company for the purpose of carrying on business unhampered by the debts plaguing J & L and that appellant is a holder of one of those debts. Appellant claims that the conduct of McWaters Trucking Company and James McWaters clearly warrants piercing the corporate veils of both J & L and McWaters Trucking Company and awarding appellant judgment against McWaters Trucking Company for all of J & L's obligations to appellant and a judgment against James McWaters for all the liabilities of both J & L and McWaters Trucking Company.

The trial court rendered judgment for appellant against J & L on the J & L note, but refused to give appellant a judgment against J & L on the Guaranty Agreement or judgment against McWaters Trucking Company or James McWaters.

Appellant brings to this Court 12 points of error which we shall group in the same manner as has appellant in its brief.

Regarding point of error number one, in which appellant contends trial court erred in failing to render judgment for appellant against J & L for breach of the Guaranty Agreement, appellee agrees that the trial court did err and that appellant is entitled to judgment against J & L for breach of the guaranty. The trial court's findings of fact and conclusions of law do show that J & L guaranteed OEI's payment obligation to appellant and that appellant made demand on J & L to satisfy its guaranty obligations. We sustain appellant's point of error number one.

■ Appellant condenses points of error two through six into a general caption that the trial court erred in failing to render judgment for Chase against McWaters Trucking Company for conversion. Here we are faced with the primary question of whether or not appellant properly perfected its security interest in the collateral which appellant now says was the subject of conversion by appellees.

Appellee takes the position that appellant's security interest was not perfected, and appellant's interest did not have priority over McWaters Trucking Company, which was a buyer not in the ordinary course of business. Appellee cites TEX. BUS. & COM. CODE ANN. §§ 9.109(2), 9.301(a)(3), 9.402(a) (Vernon 1991). Appellee further contends, and we agree, that in order for appellant to perfect its security interest in J & L's equipment and fixtures, appellant had to file a sufficient financing statement with the Texas Secretary of State. TEX. BUS. & COM. CODE ANN. § 9.302 (Vernon 1991).

Appellant contends that a security interest continues in collateral even if the collateral is sold. TEX. BUS. & COM. CODE ANN. § 9.306(b). "[S]ince the transferee takes subject to the security interest, the secured party may ... in an appropriate case maintain an action for conversion." TEX. BUS. & COM. CODE ANN. § 9.306(b), comment 3. *See also White–Sellie's Jewelry Co. v. Goodyear Tire & Rubber Co.;* 477 S.W.2d 658 (Tex.Civ.App.—Houston [14th Dist.] 1972, no writ).

Chase filed a financing statement with the Texas Secretary of State which identified the debtor as J & L, the creditor as Chase and the collateral as follows: "All fixed assets including all equipment and fixtures listed."

The trial court found that Chase was not entitled to recover against McWaters Trucking Company for conversion because Chase failed to properly perfect its security interest in J & L's non-vehicle equipment. Specifically, the trial court found that the "description" of the property contained in the financing statement filed by Chase was insufficient. The record is clear that at no time did appellant Chase list any equipment and fixtures anywhere on the financing statement. Thus, we are left to a determination of whether the non-existent list was a prerequisite to appellant's proper perfection of a security interest in the subject properties. Appellant tells us that in spite of the missing list, their security interest was perfected according to Section 9.402 of the TEX. BUS. & COM. CODE ANN. which defines the requirements of a financing statement as follows:

A financing statement is sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral.

It is appellant's position that under the express language of Section 9.402, a sufficient financing statement is one that (1) identifies by type the collateral that is subject to the lien or (2) describes the items of collateral that is subject to the lien.

We find no Texas law which is directly on point to the question before us. We believe it to be elementary however, that the burden of properly perfecting the security interest in J & L's equipment and fixtures was upon appellant. It was at all times incumbent upon appellant Chase to perfect their security interest in accordance with those guidelines set out under the TEXAS BUSINESS & COMMERCE CODE. Appellant seems to take the position that in order to properly perfect a security interest, one need only suggest "inquiry or means of identification which, if pursued, will disclose the property covered by the lien," and in support of this position, cites *Stone Fort National Bank of Nacogdoches v. Citizens State Bank of Corrigan*, 722 S.W.2d 508 (Tex.App.—Beaumont 1986, no writ); *Marine Drilling Co. v. Hobbs Trailers*, 697 S.W.2d 831 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.). We do not believe that these two cases support appellant's position. The *Marine Drilling Co.* case held that an erroneous mistaken description of collateral as "(1) 1976 Ford Forklift s/n 45614," when the serial number was actually 452614, as minor in nature and would not mislead persons because the description contained in the financing statement, when compared with an examination of the equipment itself, reveals sufficient similarities to suggest inquiry and means of identification which, if pursued, would disclose the claims security interest in the forklift. We find this to be quite different from our case in that the use of the word "listed" suggested no way to pursue and discover the alleged security interest. The use of the word "listed" certainly implies that something is to follow. In our case, nothing followed.

In the *Stone Fort National Bank* case, the financing statement stated that Stone Fort claimed a security interest in "all inventory" of James Willson Enterprises, Inc. The court held such financing statement to be sufficient to put any party subsequently considering taking a security interest in the property of James Willson Enterprises, Inc. on notice that Stone Fort claimed a security interest in any such property which would be properly classified as inventory. One can readily see that the financing statement in Stone Fort did not in any way limit the claimed security interest and one could easily conclude that such security interest covered any and all properties of James Willson Enterprises, Inc. Appellant's financing statement places a limitation on the assets and equipment of J & L by implying that such security agreement only covered those items "listed." The word "listed" mandates inclusion and inclusion of necessity compels exclusion.

We do not view these two Texas cases as probative to a disposition of our case. Due to the lack of Texas authority close on point, appellant relies on several cases from other states' jurisdictions along with Federal cases. We address only those cases which we believe may shed some light on our decision. *In re Tebbs Construction Co., Inc. v. Small Business Administration*, 39 B.R. 742 (E.D.Va.1984) involved a situation where creditor "A" filed a financing statement which identified the collateral as, "[a]ccounts receivable, inventory, and those items of machinery and equipment, with replacements thereof, as set forth in the attached security agreement." Creditor "A" failed to file the security agreement. A priority dispute developed between creditor "A" and creditor "B" with creditor "B" subsequently filing a financing statement covering the debtor's machinery and equipment. Creditor "B" argued that its lien had priority because creditor "A's" failure to file the security agreement rendered its financing state-

ment deficient. The Virginia Court disagreed with Creditor "B" stating:

> [T]he use of ... "types" of collateral is in itself a sufficient description of collateral under the Commercial Code.

The court concluded that creditor "A's" failure to further describe the collateral by attaching the security agreement did not render the financing statement deficient, as the financing statement complied with Section 9.402 requirements by identifying the collateral by type.

Appellee in our case highlights that the *Tebbs* security agreement, although not attached to the financing statement, had been "otherwise publicly filed" and was incorporated by reference. We believe *Tebbs* to be also distinguishable from the instant case in that the item that was not attached to the financing statement in *Tebbs*, the security agreement, was a tangible item that did exist, while in the instant case, no such "list" was made, and no reference was made to the security agreement. We think it significant to mention that the *Tebbs* case involved a trustee in bankruptcy and creditors, both secured and unsecured.

*In re Stegman*, 15 U.C.C. Rep.Serv. (Callaghan) 225 (S.D.Fla.1974), and *In re Bowser*, 1 U.C.C. Rep.Serv. (Callaghan) 626 (W.D.Pa.1961) both involved financing statements in which reference was made to specific attachments which were inadvertently omitted. The *Stegman* Court held that the fact that "schedule A" was referred to in the financing statement in addition to the phrase "various equipment" should have put a reasonable searcher on notice. We do not believe the financing statement in our case would indicate to a reasonable searcher that the items "listed" would be listed anywhere other than on the financing statement itself. *Bowser* also involved an attachment, the Conditional Sales Contract, which fully and in detail described the property in question. The words "See Attached" appeared in the space provided for the description on the filed papers. Additionally, the property subject to the agreement was labeled by metal plates stamped with the creditor's name and affixed thereto. The court specifically relied on this label when it held the financing statement to be sufficient.

A case we believe to be more in tuned to our present situation is *First National Bank of St. Charles v. Chemical Products, Inc.*, 637 S.W.2d 373 (Mo.App.1982). In that case, the financing statement listed six items on the U.C.C.–1 form followed by the parenthetical, "See Attached List." The attached list was not attached to the financing statement and was never filed with the Secretary of State either "because of negligence of that office or of appellant." The Security Agreement properly described all of the property. The controversy arose between a subsequent security interest holder and First National Bank. In holding that First National Bank had not perfected a security interest in property listed on the unattached list, the court held that the filing was inadequate.

In *The Matter of H.L. Bennett Co.*, 588 F.2d 389 (3rd Cir.1978), the financing statement identified the collateral as "[a]ll assets as contained in the security agreement (installment note) executed even date herewith." The security agreement was not attached or filed with the Secretary of State. That Federal Court of Appeals held that the description of the collateral was insufficient.

It seems to be our appellant's position that so long as the type of collateral is listed on the financing statement, all confusion is erased. We cannot accept this broad and general interpretation of Section 9.402 of the TEX. BUS. & COM. CODE ANN. (Vernon 1991). We believe, as did the *Bennett* Court, that such a general and shotgun approach to describing collateral in a Security Agreement, leads to confusion. The *Bennett* Court stated, "We are particularly unwilling to excuse appellee's failure to comply with the requirements of section 9–402(1) when the failure to do so has the tendency to confuse a subsequent creditor." *Bennett*, 588 F.2d at 394.

We can only speculate as to what subsequent purchasers or creditors or anyone else having an interest in the elusive subject collateral might conclude when viewing

the rest

the particular financing statement filed by appellant in our case. The description of collateral which states: "All fixed assets including all equipment and fixtures listed," certainly demands further search or inquiry, however, where does such search and inquiry begin and end? Yes, our financing statement identified J & L as the debtor and Chase as the creditor and yes, an inquiring party could communicate with either or both seeking for their interpretation of what the term "fixtures listed" means. The confusion resulting from such inquiry could be a time consuming process resulting in speculative reliance upon representations outside the financing statement. Were this the true intent of Section 9.402 of the TEXAS BUSINESS AND COMMERCE CODE, we opine that our legislature would have and could have simply stated that, "all inquiries regarding collateral covered by this financing statement should be directed to the listed debtor and the secured party."

Our legislature went further requiring that the financing statement contain, "a statement indicating the types, or describing the items of collateral." Section 9.402(a) TEX. BUS. & COM. CODE ANN. (Vernon 1991).

■ We do not believe it unduly burdensome to require one seeking to be secured under, by and through the TEX. BUS. & COM. CODE, to describe the collateral subject to their security interest in an unambiguous and clear manner. We believe that any ambiguity or confusion resulting from a description of collateral, or the lack thereof, should be construed strictly against that party seeking to perfect a lien on intended collateral.

We affirm the trial court's conclusion that appellant's financing statement was insufficient to perfect a security interest to any of J & L's equipment and fixtures and we find no error in the trial court so holding.

■ This holding leads us to the obvious inquiry of whether the subsequent purchase of J & L's equipment and fixtures by McWaters Trucking Company effectively cut off appellant's claimed security interest. We hold that it does.

TEX. BUS. & COM. CODE ANN. § 9.301(a)(3) (Vernon 1991) states:

(a) ... an unperfected security interest is subordinate to the rights of
(3) in the case of goods ... a person who is not a secured party and who is a ... buyer not in the ordinary course of business ... to the extent he gives value and receives delivery of the collateral without knowledge of the security interest and before it is perfected;
...

■ Applying this section to our case, the first requirement is that the unperfected security interest be in goods. TEX. BUS. & COM. CODE ANN. § 9.109(2) (Vernon 1991). The second requirement is that McWaters Trucking Company be a buyer not in the ordinary course of business. Our review of the evidence shows that J & L was not in the business of selling off its equipment, but to the contrary, used that equipment in its business of hauling lumber. The third requirement is that McWaters Trucking Company give value for what it received from J & L. The uncontroverted testimony showed that the total value of the equipment transferred was $630,000.00 of which $268,000.00 was for non-vehicle equipment. The total indebtedness that McWaters Trucking Company agreed to pay for J & L was approximately $681,615.00. Thus, we see that more money in indebtedness was paid than was the value of the equipment received, thus, value was clearly given. The fourth requirement is that McWaters Trucking Company received delivery and we find no contention that McWaters Trucking Company did not receive delivery of the equipment in question. The final requirement is that McWaters Trucking Company had no knowledge of appellant's security interest at the time of the transfer. Knowledge is defined in TEX. BUS. & COM. CODE ANN. § 1.201(25) (Vernons 1968) states:

A person has "notice" of a fact when
(A) he has actual knowledge of it; or
(B) he has received a notice or notification of it; or

(C) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.

A person "knows" or has "knowledge" of a fact when he has actual knowledge of it. "Discover" or "learn" or a word or phrase of similar import refers to knowledge rather than to reason to know.

The evidence in our case is clear that neither James or Ronnie McWaters nor McWaters Trucking Company had knowledge of the 8.5 million dollar loan, the guaranty, or the alleged security interest in J & L's equipment until after the purchase and delivery of J & L's equipment by McWaters Trucking Company. The trial court's finding that James McWaters was not aware that appellant had filed a financing statement covering J & L's equipment, may not constitute a defense to conversion; however, it does support the finding that McWaters Trucking Company had priority over appellant's unperfected security interest. We are, however, led to conclude that since appellant's security interest was unperfected, and McWaters Trucking Company's transfer of J & L's equipment had priority over an unperfected security interest, that appellant's claim for conversion must fail. We, therefore, hold that the trial court was correct in refusing to render judgment against McWaters Trucking Company for conversion, in finding that appellant's security interest was unperfected because the description of collateral was insufficient, in finding that the assets of J & L were properly transferred to McWaters Trucking Company, and in finding that McWaters Trucking Company had no knowledge of appellant's security interest. Based upon our findings and holdings, we overrule appellant's points of error two through six.

■ Appellant's points of error 7 through 12 contend trial court error in failing to pierce the corporate veils of J & L and McWaters Trucking Company and hold McWaters Trucking Company liable for all of J & L's obligations to Chase, and failing to hold James McWaters liable for all of J & L's and McWaters Trucking Company's obligations to Chase.

■ Generally, the corporate form normally insulates shareholders, directors and officers from liability for corporate obligations. *Gentry v. Credit Plan Corporation of Houston*, 528 S.W.2d 571, 573 (Tex. 1975). However, in certain situations the courts have refused to recognize the corporate shield and have allowed plaintiffs to recover against shareholders individually. *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex.1986) stated: "We disregard the corporate fiction, even though corporate formalities have been observed and corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result." Citing *Bell Oil & Gas Co. v. Allied Chemical Corp.*, 431 S.W.2d 336 at 340 (Tex. 1968).

*Castleberry* set forth the following six examples of where the corporate fiction would be disregarded:

(1) when the fiction is used as a means of perpetrating fraud;

(2) where a corporation is organized and operated as a mere tool or business conduit of another corporation;

(3) where the corporate fiction is resorted to as a means of evading an existing legal obligation;

(4) where the corporate fiction is employed to achieve or perpetrate monopoly;

(5) where the corporate fiction is used to circumvent a statute; and

(6) where the corporate fiction is relied upon as a protection of crime or to justify wrong.

*Castleberry* was a case truly illustrative of a sham to perpetuate a fraud. In that case, three men, Castleberry, Branscum and Byboth, formed a furniture moving corporation called Texan Transfer, Inc. The corporation was progressing along until such time that a disagreement ensued among Castleberry, Branscum and Byboth. As a result of this disagreement, the three men agreed that Texan Transfer would buy back Castleberry's stock, and Castleberry received a corporate promissory note for

approximately $42,000.00. Texan Transfer defaulted on $41,000.00 of the note and Castleberry filed suit. Subsequent to suit being filed, Byboth and Branscum started another moving company called Custom Carriers, Inc. which began using Texan Transfer's equipment to do its moving work and fulfill its moving contracts. Byboth and Branscum terminated Texan Transfer's contract with its most profitable client and obtained the contract for Custom Carriers. Byboth and Branscum also sold Texan Transfer's trucks, its only assets, to Custom Carriers and with the money they paid themselves "back salaries." For a two year period, Texan Transfer was left broke with no assets and unable to pay its note to Castleberry due to the actions of Byboth and Branscum. Our Texas Supreme Court allowed the piercing of the corporate veil in that case because it was clearly a sham to perpetuate a fraud.

In our case, the evidence showed that J & L was already "broke" when the McWaters family regained ownership of J & L's stock and that it was not due to any fault on the part of the McWaters family. When the McWaters family regained ownership of J & L's stock, it was not an ongoing business like Texan Transfer. The assets of J & L were not sold to McWaters Trucking Company to hinder the business or hinder its ability to pay off its debts. It was obviously impossible for J & L to pay all the debts it owed and McWaters Trucking Company assisted J & L to pay all its known debts, when McWaters paid more than the equipment was worth. The Supreme Court in *Castleberry* held that the corporation fiction would be disregarded when the "facts are such that adherence to the fiction would promote injustice and lead to an inequitable result." *Castleberry*, 721 S.W.2d at 273. In our case, equity tends to favor McWaters Trucking Company and James McWaters in that it is undisputed that James McWaters and McWaters Trucking Company had no involvement in the making of the 8.5 million dollar loan, the guaranty, or the encumbering of J & L's equipment. This was all done by Delta personnel who depleted the cash earned by J & L for other purposes without the knowledge of James McWaters. In fact, there was evidence showing that James and Ronnie McWaters thought they had been insured, that they would know of any encumbrances of J & L equipment when they insisted that their agreement with Delta include the provision which required that they remain on the Board of Directors of J & L as long as any indebtedness to them was owed. Further facts reveal that James McWaters had no idea that he had been voted off the board in violation of his agreement with Delta so that a resolution could be passed authorizing a Delta person, Leon Toups, to sign all papers for the loan and guaranty. Appellant even testified that it never dealt with the McWaters family in any of the loan and guaranty transactions. Furthermore, not only did James McWaters not participate in the loan, or know anything about same, but neither he nor J & L received any benefit from that loan.

In the cases cited by appellant in support of its contention that the corporate veil should be pierced, the conduct of the parties in those cases clearly illustrate the conduct required in order to resort to piercing the corporate veil. We do not find that type of conduct in our case.

Appellant points out that the testimony of James McWaters is extremely illuminating as to the reason for the creation of McWaters Trucking Company and the secession of J & L. Appellant contends that this transaction was done for the purpose of avoiding J & L's creditors. We can find no place in James McWaters' testimony that would lead one to conclude that the creation of McWaters Trucking Company was for the purpose of avoiding creditors of J & L. We view the testimony of James McWaters to be to the contrary. We cite from the record the following:

Q. What you did was form a new corporation which was debt free; that was McWaters Trucking Company, correct?

A. Right.

Q. This new company acquired all the assets of J & L, correct?

A. Right.

Q. This new company also picked up some of the liabilities of J & L, correct?

A. All of them I knew about.

Query; if McWaters Trucking Company was established for the purpose of avoiding creditors of J & L, then why would McWaters Trucking Company pick up all of J & L's liabilities which were known to James McWaters?

The evidence showed that it was impossible for J & L to continue operating. McWaters Trucking Company did not step in and take over a business that was even capable of continuing to operate. For reasons stated, appellant's points of error 7, 8, 9, 10, 11 and 12 are overruled.

The trial court erred in not granting appellant judgment against J & L on the J & L guaranty. We, therefore, reverse the trial court and render judgment against J & L General Contractors, Inc. on the Guaranty Agreement in favor of appellant, Chase Manhattan Bank. In all other regards, the judgment of the trial court is affirmed.

REVERSED AND RENDERED IN PART AND AFFIRMED IN PART.